**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIM. NO. 16-CR-136 (RC)** |
| | : | |
| **v.** | : | |
| | : | |
| **TERRY ALBRIGHT,** | : | **CSENT: 12/19/16** |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. For the reasons set forth herein, the government recommends that the Court sentence the defendant to a sentence at the low end of the guideline sentencing range. The government further recommends that the Court sentence the defendant to 120 months of supervised release, with conditions to include that the defendant undergo intensive sex offender treatment, the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised. The defendant is required by statute to register as a sex offender for a minimum period of 15 years.

## I. BACKGROUND

On September 28, 2016, the defendant pled guilty to one count of Distribution of Child Pornography and one count of Travel with Intent to Engage in Illicit Sexual Conduct. During the plea hearing, the defendant admitted the following facts, as set forth in the written Statement of Offense, to be true.

In August 2015, Detective Timothy Palchak was acting in an undercover capacity as part of the Federal Bureau of Investigation ("FBI") Child Exploitation Task Force. Acting as an undercover officer ("UC") in Washington, D.C., he posted an online advertisement in a

predicated area of the online website for classified advertisements, which, based on his experience and information gathered from other sources, is an area of the website that is frequented by individuals who have a sexual interest in children and incest. The advertisement was intended to attract individuals with a sexual interest in children through the use of adjectives such as "taboo."

On August 20, 2015, an individual, subsequently identified as Terry Albright (defendant) responded to the post, stating that he was a “perv dad.” During this email exchange, the defendant stated that he has a 13-year-old daughter and that he had set up peep-holes in his bathroom in Baltimore to spy on her naked. The UC told the defendant that he had a 9-year-old daughter.

The UC and the defendant subsequently moved their conversation over to KIK, which is a free texting application for mobile devices. The defendant’s KIK username was tbonebalt2012 and his KIK profile picture was of the lower portion of his face. The defendant sent the UC an image of his 13-year-old daughter at Disney, and then a pair of his daughter’s pink underwear and bra. The UC and the defendant then engaged in the following conversation:

| | |
|---|---|
| DEFENDANT: | Is your attraction to her because she is a little girl or because she is your daughter. |
| UC: | Both what about for you |
| DEFENDANT: | At first it was as a young girl but watching a lot of incest porn lately and now as a daughter also. Her boobs are starting to round out nicely, I love watching them through peephole…I just want to suck on them so badly. |

On August 24, 2015, the UC asked the defendant if he had any “spy pics” of the defendant’s daughter, and in response, the defendant texted the UC a dark image of a girl on a

sofa with the image zoomed in on her naked upper thighs. The defendant explained that this was an image of his daughter "[s]leeping on couch other night…[d] efinitely made me horny." This was the last communication between the UC and the defendant until June 6, 2016, when the UC responded to a post on Craigslist with post ID 5594925494, entitled "Daddy Incest- m4mw (Baltimore)." The body of the post was the following:

> I am a biwm seeking a daddy who has a daughter/son as his play toy and would like to share his experience with me. I enjoy hearing about the special attraction between two individuals. What I would ultimately like is that we meet and I can either watch or have the privilege of joining in, up to you to allow, but is not necessary. Nothing will freak me out, the kinkier more taboo the relationship the more I will enjoy. Please get in touch, so we can chat.

The UC responded to this post without knowing that the post was created by the defendant. The UC emailed the defendant, "perv dad here with daughter," and the defendant emailed back, using email account tbonebalt1971@gmail.com. The defendant responded that the UC should tell him about his daughter and "situation." The defendant stated he was in "Baltimore," his KIK username was tbonebalt2012, and that he was "fine with all ages." Upon the UC sending the defendant a message over KIK, the UC realized that it was the same individual who had previously responded to the UC's post in August 2015, and whom the UC had previously been communicating with.

Thereafter, the UC and the defendant continued to communicate over KIK. The UC told the defendant that he had a 10-year-old daughter, and the defendant stated that 10 years old was a "great age, right in my favorite age range." The defendant asked the UC to send a picture of his 10-year-old daughter, and inquired of what sexual acts the UC had engaged in with the child. The UC asked the defendant if the defendant had any "special" pictures to send, and in response, he stated that he had "a couple that someone sent me…butt and pussy."

On June 6, 2016, the defendant texted the UC, who was in Washington, D.C., several images of a female child who was 7 years old. Two of these images focused on the child's bare genitalia. A third image was of an adult male holding his penis against the female child's bare buttocks. A fourth image was of a female child bent over with an adult finger spreading open the child's anus so that both her anus and genitalia are visible and the focal point of the image. The UC also sent the defendant an image of the UC's purported 10-year-old daughter (note that the image was not of a real child). In response, the defendant responded, "[v]ery nice." Additionally, on June 10, 2016, the defendant texted the UC more images of the same child, to include several images of the child wearing nylons and exposing her bare buttocks, five images that focus on the child's bare genitalia, and one image of a finger pressing open the child's anus.

The defendant subsequently explained that he had received the above mentioned images of child pornography from "someone else who responded to ad" but who was no longer actively communicating with him. The defendant stated that he knew that these images of the child were of the individual's daughter. The defendant expressed disappointment that the individual had stopped communicating with him, because the child "was cute, definitely would have been into playing with her as well."

The defendant asked the UC if he has "ever thought about or have you shared her with others," and inquired as to whether he could "build the trust" so that it "works out." The defendant stated that he has a 14-year-old daughter, which is consistent with his stating to the UC a year earlier that his daughter was 13 years old. Thereafter, the defendant sent two images of his 14-year-old daughter that appear to have been taken without her knowledge: an image of his daughter's cleavage, and an image of his daughter lying in bed wearing yoga clothing with her back facing the camera.

Due to the images of child pornography that the defendant had distributed to the UC, and his willingness to travel and engage in sexual acts with the UC's purported 10-year-old daughter, on or about June 6, 2016, the UC sent the defendant's KIK username and email account to a Federal Bureau of Investigation (FBI) Intelligence Analyst, so that the defendant could be identified. Thereafter, the UC learned from the FBI Intelligence Analyst that the defendant was also actively communicating with another undercover officer from the Fairfax County Police Department (Virginia), and that the defendant had specific plans to travel to Washington, D.C. for purposes of engaging in sexual acts with that undercover officer's purported 5-year-old daughter.

The following information pertains to the defendant's communications with this second undercover officer.

In May 2016, while operating in an undercover capacity, an officer with the Fairfax County Police Department responded to a posting by the defendant on Craigslist with post ID 5512767432, titled "Taboo Parent (Maryland)." The body of the advertisement stated the following:

> Looking for the parent that has a special bond with their son or daughter. I want to hear your stories of incest. I want to know what lead to that special connection, as well as what types of things you do together. I would love for you to "share" the experience with me but if you only want to tell me about them, that is cool. Age is no concern, older is fine, younger is better. Please get in touch.

On May 9, 2016, the Fairfax County Police Department's UC (FCPD UC) responded to the posting, stating "you looking for real or just rp and fantasy? I am real father of 2 young ones…let me know." On that same day, the defendant responded, stating, "Definitely looking for real. Tell me about your two and experience, thanks."

Thereafter, the FCPD UC and the defendant continued to communicate via Craigslist email. The FCPD UC told the defendant that he had a daughter who was 5 years old and a son who was 7 years old. The FCPD UC stated that he was "active" with his 5-year-old daughter but not his son. The defendant replied, "I am bi, so willing to explore both sexes." The FCPD UC asked the defendant what he would want to do with the UC's children, and the defendant stated, "would like to start off with oral sex with both and progress from there if everybody is willing and comfortable."

On May 10, 2016, the defendant gave the FCPD UC his email address, tbonebalt1971@gmail.com, which is the same email address that the defendant used to communicate with the UC in Washington, D.C. in June 2016. The conversation then continued over the defendant's personal email. On May 10 and May 11, 2016, the defendant sent two photographs of himself to the FCPD UC, and these photographs were consistent with the KIK profile picture associated with username tbonebalt2012, whom the first UC had been communicating with.

On May 24, 2016, the defendant continued his discussion with the FCPD UC, stating the following:

> I'm thinking that if this may be more than a one time thing, that maybe I can watch the two of you and then either I can join in or take over, which ever makes the situation better. But I would like to mainly go with licking and sucking the first time, then progress from there.

The FCPD UC and the defendant discussed meeting in person to confirm that neither were law enforcement and that this was "real." A meeting was arranged between the FCPD UC and the defendant for June 2, 2016 in Washington, D.C. At approximately 3:00 p.m. on June 2, 2016, the defendant arrived at the pre-arranged location. During the fifteen minute conversation between the defendant and the FCPD UC, the defendant confirmed that he drove from Baltimore,

Maryland for the meet. He stated that he wished to have oral sex with the FCPD UC's 5-year-old daughter. He stated that he uses TOR to look at child pornography, but does not download or save any of the images. The FCPD UC and the defendant discussed meeting at a hotel in Washington, D.C. with the FCPD UC's 5-year-old daughter so that the defendant could both perform and have oral sex with her, and they discussed the defendant bringing a toy for the purported child.

After the in person meeting, the FCPD UC and the defendant continued to communicate via the defendant's personal email. The defendant arranged to travel to Washington, D.C. from Maryland on June 15, 2016 for the purpose of engaging in sexual acts with the FCPD UC's child.

On June 12, 2016, the defendant stated the following in response to the FCPD UC's inquiry of what the defendant intended to do with the FCPD UC's 5-year-old daughter:

> I'd like to play with her, lick her, maybe finger her, and rub my cock on her. I know you said you haven't penetrated her so that's probably not an option but would like to have her suck me and put the tip near her pussy. Does she swallow if I cum in [her] mouth or do I need to cum on her? I'm not sure if you are comfortable with this but I really would love to see her sucking/playing with two cocks at the same time, maybe towards the end, it could lead to me leaving and you getting some play time. Just my ultimate fantasy. I would like some alone time with her if possible[…]

On June 13, 2016, the defendant provided the FCPD UC with his KIK username: tbonebalt2012, which is the same KIK username that the defendant used to communicate with the UC in Washington, D.C. in both August 2015 and June 2016. The FCPD UC asked if the defendant had any images to share, and he stated that he would send them when he left work. Later that day, the defendant sent the FCPD UC seven images of a pre-pubescent female while the FCPD UC was in Virginia. The defendant similarly told the FCPD UC that these images were received from another person that the defendant was communicating with who had replied

to an "ad" that the defendant had placed, and were images of this individual's daughter. The specific images that were child pornography included an image of the child, nude from the waist down, with her genitalia exposed, and an image of the same child wearing underwear pulled down to expose her genitalia.

On June 15, 2016, the defendant traveled from Maryland to the pre-determined meet location in Washington, D.C. The defendant approached the FCPD UC and engaged in a brief conversation. The defendant reiterated that he wanted to perform several sexual acts on the FCPD UC's 5-year-old daughter. The defendant had brought with him a Disney shopping bag that contained dolls from the Disney movie, Frozen, and toys for the child. The defendant was arrested by members of the Child Exploitation Task Force as he and the FCPD UC were walking towards the hotel entrance to go meet with the FCPD UC's 5-year-old child.

During a search incident to arrest of the defendant's person and his vehicle, two cellular phones were recovered: a Samsung Galaxy S7 (S/N R38-H30Z0YGZ), and a Samsung S5 (S/N/: r3ef8offklb). Also in his vehicle, investigators found a receipt from the Disney Store in Baltimore, Maryland, dated June 14, 2016, for the items the defendant had with him in the Disney bag. The receipt was for approximately $40.00. A subsequent forensic analysis of the cellular phone, Samsung S5, identified the same child pornography images that the defendant had sent to both of the UCs during his communications with them.

The defendant waived his rights and was interviewed by FBI Agent Farrell and Metropolitan Police Department Sergeant Batton. The defendant admitted to traveling from Maryland to Washington, D.C. for purposes of engaging in sexual acts with the FCPD UC's 5-year-old child. He admitted that he brought toys for the child. Further, he admitted that he had sent images of child pornography to the FCPD UC, and that he had received images of child

pornography from other individuals who had communicated with him over Craigslist in response to his posts.

On June 16, 2016, members of the FBI Child Exploitation Task Force executed a search warrant on the defendant's home in Rosedale, Maryland. Located next to the bathroom door knob was a hole that could be used as a "peep-hole" to view inside the bathroom, as the defendant had initially indicated in his communications with the first UC. Note, however, that the defendant's wife has indicated that the hole was there when the family moved into the home.

## II. SENTENCING CALCULATION

### A. Statutory Penalties

Distribution of Child Pornography carries a maximum sentence of 20 years of imprisonment and a term of imprisonment not less than 5 years pursuant to 18 U.S.C. § 2252A(b)(1), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, and a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k).

Travel with Intent to Engage in Illicit Sexual Conduct carries a maximum sentence of 30 years of imprisonment pursuant to 18 U.S.C. § 2423(b), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571, and a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k).

In addition, there is a mandatory special assessment for each felony conviction pursuant to 18 U.S.C. § 3013(a)(2)(A).

Pursuant to 42 U.S.C. § 16911(3)(B), the defendant will be considered a Tier I sex offender for purposes of the Sex Offender Registration and Notification Act "SORNA."

Pursuant to 42 U.S.C. § 16015(a)(1), as a Tier I sex offender, the defendant will be required to register as a sex offender for 15 years. The defendant will also be subject to local and state registration requirements.

**B. Guidelines Range**

The government agrees with the calculation of the defendant's Guidelines range set forth in the Presentence Investigation Report ("PSR").

For the charge of Distribution of Child Pornography, the base offense level is 22 pursuant to U.S.S.G. § 2G2.2(a)(2). PSR ¶ 56. The offense involved material depicting a prepubescent minor, adding two levels pursuant to § 2G2.2(b)(2). PSR ¶ 57. The offense involved distribution, adding two levels pursuant to § 2G2.2(b)(3)(F).[1] PSR ¶ 58. The offense involved use of a computer, adding two levels pursuant to § 2G2.2(b)(6).[2] PSR ¶ 59. The offense involved at least 10 images but less than 150 images, adding two levels pursuant to § 2G2.2(b)(7)(A). PSR ¶ 60. The defendant's adjusted offense level is 30.[3] PSR ¶ 64.

For the charge of Travel with Intent to Engage in Illicit Sexual Conduct, U.S.S.G. § 2G1.3 applies; however, because the offense involved interstate travel with intent to engage in

---

[1] Defense counsel is free to litigate the applicability of this additional 2-point increase for "distribution generally," since the defendant is already pleading guilty to a distribution offense, which carries a higher base offense level than its counterpart, a possession offense. For example, Possession of Child Pornography has a base offense level of 18 pursuant to U.S.S.G. Section 2G2.1(a)(1), but Distribution of Child Pornography has a base offense level of 22. Accordingly, the guidelines have already considered that the charge of distribution, generally, entails a four-point increase to the offender's base offense level.

[2] Defense counsel is free to litigate the applicability of this additional 2-point increase for "use of a computer" in light of the fact that most everything today is communicated via some type of media or electronic forum.

[3] Without the two-point increases mentioned in Footnote 1 and Footnote 2, the defendant's adjusted offense level would be 26 for the charge of Distribution of Child Pornography.

sexual contact with a minor under the age of 12, the cross-reference at U.S.S.G. § 2G1.3(c)(3) applies, triggering the application of U.S.S.G. § 2A3.1. The base offense level is thus 30. PSR ¶ 65-66. The offense involved a purported victim who had not attained the age of 12 years, adding four levels pursuant to U.S.S.G. § 2A3.1(b)(2).[4] PSR ¶ 67. The offense involved the use of a computer, adding two levels pursuant to U.S.S.G. § 2A3.1(b)(6).[5] PSR ¶ 68. The defendant's adjusted level is 36.[6] PSR ¶ 72.

The multiple count adjustment is calculated as follows. Pursuant to U.S.S.G. § 3D1.4, Count 1 (adjusted offense level of 30) is assigned ½ unit because it is 5 to 8 levels less serious than the offense with the highest offense level, and Count 2 (adjusted offense level of 36) is assigned 1 unit. PSR ¶ 73. With 1 ½ units, one level is added to the highest offense level (36) for a combined adjusted offense level of 37.[7] PSR ¶ 73-76.

---

[4] Arguably, the cross section for U.S.S.G. § 2G1.3(c)(3), which increases the base offense level for the crime of Travel with Intent to Engage in Illicit Sexual Conduct from 24 to 30, already takes into account the young age of the victim. However, the government submits that this case is unique in the fact that the defendant traveled for a child *well below* the age of 12-years-old. Rather, the defendant traveled for the purpose of having sex with a 5-year-old child. It is this reason that the government believes that the additional 4-point increase associated with U.S.S.G. § 2A3.1(b)(2) is applicable and should be applied in this case.

[5] Again, the defense counsel is free to litigate the applicability of the two-point increase for "use of computer."

[6] Without the two-point increase mentioned in Footnote 5, the defendant's adjusted offense level would be 34.

[7] Without the point increases mentioned above, however, the defendant's adjusted offense level for Distribution of Child Pornography would be 26, and for Travel with Intent to Engage in Illicit Sexual Conduct it would be 34. Because there is an eight-point difference between offenses, Count 1 would receive ½ unit, and thus, there would be no increase in the combined offense level. (See U.S.S.G. § 3D1.4(b)). Accordingly, the combined offense level would be 34. With a three-point decrease for the defendant's acceptance of responsibility, the total offense level would be 31. The resulting guideline range for offense level 31 and a criminal history category of I would be 108-135 months of incarceration.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). PSR ¶ 78. The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources. PSR ¶ 79. As a result, the defendant's total offense level is 34. PSR ¶ 80.

The defendant has no criminal convictions that result in any criminal history points. Accordingly, the defendant has a criminal history score of zero and is in criminal history category I. PSR ¶ 81-85.

With a total offense level of 34 and a criminal history category of I, the defendant's sentencing range is 151 to 188 months of incarceration. PSR ¶ 134.

## III. GOVERNMENT'S RECOMMENDATION

### A. Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. These factors

include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

On February 27, 2013, the Sentencing Commission released a report concerning the Guidelines for child pornography offenses ("The CP Report"). The CP Report contained numerous observations that are relevant to a sentencing judge. The CP Report recognized that child pornography offenses inherently involve the sexual abuse and exploitation of children, that child pornography victims are specifically harmed by the distribution of their images over the Internet, and that many victims suffer lifelong harm at know that their images are being used by offenders for sexual gratification. The CP Report emphasized the growing problem of online child pornography communities that facilitate and validate child sexual exploitation. The CP Report also identified many problems with the non-production child pornography Guidelines and included recommendations about how to change the Guidelines to better account for offender behavior, including through the elimination of some specific offense characteristics and the revision and addition of other enhancements.

Although the Commission has asked Congress for permission to revise the child pornography Guidelines, no changes have been made at this time. The CP Report provided a

framework of factors to consider under the statute. These factors should be considered in conjunction with – not instead of – the existing Guidelines. Unless and until Congress permits and the Commission makes changes to the Guidelines, a sentencing court should determine a defendant's Guidelines range based on the current Guidelines. A sentencing court should then consider the CP Report as part of its analysis of the statutory factors.

**B. Basis for the Government's Recommendation**

The government requests a sentence of incarceration at the low end of the guideline range. Such a sentence is appropriate and warranted in this case based on the factors in 18 U.S.C. § 3553(a). In addition, the government recommends 120 months of supervised release, with the specific conditions of supervision recommended below. The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

**1. The Nature and Circumstances of the Offense**

The nature and circumstances of the offense charged is egregious. But for the fact that the defendant was, unbeknownst to him, communicating with a UC, the defendant had every intention of traveling to Washington, D.C. for the purpose of sexually assaulting a 5-year-old child – specifically, to "lick her, maybe finger her, and rub my cock on her…have her suck me and put the tip near her pussy." The defendant posted two separate advertisements on Craigslist that were directed to fathers who had access to vulnerable children. The defendant specifically sought out a "daddy who has a daughter/son as his play toy," who was amenable to "shar[ing]" the "incest" experience with him.

Even more egregious are the images that the defendant actively sought out and traded in. These images were not "Internet" images, or commonly traded images, but were images of current, hands-on abuse of fathers who were sexually abusing their daughters. The defendant not only knew that these were present-day, hands-on images documenting this sexual abuse, but

delighted in this fact for his own sexual pleasures. The defendant only expressed regret over this child's on-going sexual abuse in that he could not also join in with the father, who had ceased communicating with him. As the defendant, himself, stated: this vulnerable, abused child "was cute, definitely would have been into playing with her as well."

Accordingly, this is not an individual who just passively stumbled into this world of child pornography and child exploitation, but rather, one who actively participated in it- posting his own advertisements to attract individuals to trade with, and who affirmatively set up plans to meet with anyone willing to exploit their own children. In making these plans, the defendant took several affirmative steps that demonstrate his intense dedication to his perverse plan: (1) he traveled over an hour to meet with the FCPD UC in advance to ensure he was not law enforcement and to discuss the specific acts the defendant would be able to engage in with this five-year-old child, (2) he went to the Disney store the day before to buy the purported child $40 worth of toys, (3) he traveled over an hour to sexually assault a five-year-old child, and (4) had $100 to help contribute to the hotel room where these sexual acts were to take place.

What is important to note is that child pornography is not just about images and videos, but it is about children. It is about children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly abused. The abuse of child pornography victims does not end, however, when the physical contact or production of images or videos is over. The abuse and harm go on as long as those images and videos are viewed, traded, collected, and used by offenders for sexual gratification. This harm cannot be overstated. Particularly in the Internet age, victims of child pornography must attempt to cope with the knowledge that worst moments of their young lives are forever memorialized and available to child pornography consumers. Individuals – like the defendant – who receive, seek, view, keep, distribute and use child

pornography for their own sexual gratification are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos and promotes the brutalization of even more children for new images and videos. In this case, the defendant sent child pornography to the UC to prove that he was legitimate, serious, and could be trusted to join in the sexual exploitation of a child.

Courts have long recognized the harms posed by child pornography offenders. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10. The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10.

Recently, in Paroline v. United States, the Supreme Court discussed the harms caused by child pornography traffickers in the context of restitution for victims of child exploitation:

> Child pornography possessors are jointly liable under this standard, for they act in concert as part of a global network of possessors, distributors, and producers who pursue the common purpose of trafficking in images of child sexual abuse. As Congress itself recognized, "possessors of such material" are an integral part of the "market for the sexual exploitative use of children." […] Moreover, although possessors like Paroline may not be familiar with every last participant in the market for child sexual abuse images, there is little doubt that they act with knowledge of the inevitable harms caused by their combined conduct. Paroline himself admitted to possessing between 150 and 300 images of minors engaged in sexually explicit conduct, which he downloaded from other offenders on the Internet. […] By communally browsing and downloading Internet child

> pornography, offenders like Paroline "fuel the process" that allows the industry to flourish. […] Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy," […]—the quintessential concerted action to which joint and several liability attaches.

Paroline v. United States, 134 S. Ct. 1710, 1741 (2014) (citations omitted).

Accordingly, the nature of the defendant's offenses are each particularly egregious, and his crimes have proven lasting and devastating consequences on the victims and the community.

**2. History and Characteristics of the Defendant**

In most criminal cases, a defendant will appear for sentencing and offer mitigating evidence, asking the Court to consider the defendant's sometimes less obvious, but positive attributes. In child exploitation crimes, however, a defendant's good qualities are frequently the easiest to see. Defendants appear to be like any other law-abiding citizen—they work, worship, and have the support of their families, much like the defendant here. Their crimes against children, and the reasons they commit them, have been hidden from colleagues, friends, and loved ones. Despite that fact, the perpetrator's private crime is a horrific one, and offenders must be held accountable for their crimes.

Notably here, the defendant's lack of a criminal history and his family support was already considered by way of the plea offer that was provided to the defendant. This is because the plea offer included the condition that the government would forego an additional count of Distribution of Child Pornography in the Eastern District of Virginia, based on the defendant's distribution of child pornography images to the undercover officer in the Commonwealth of Virginia. Accordingly, the defendant could have been facing two separate trials, of which both would have included a charge that required a mandatory minimum sentence of 60 months of incarceration. By way of this plea, the defendant is only facing one distribution offense.

### 3. Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence at the low-end of the guidelines is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses. The defendant's effort to have sex with a child and his distribution of child pornography are crimes that harm society and specific child victims and warrant a significant sentence of imprisonment. A less substantial sentence would not provide requisite deterrence for the defendant or other offenders and thus would not adequately protect the public. The defendant will be able to receive sex offender treatment and any other treatment that may become necessary while he is incarcerated.

### 4. Available Sentences and Supervised Release Conditions

The defendant should be sentenced to a term of incarceration. The defendant is not eligible for a probationary sentence under the Guidelines, and a sentence of probation would be inappropriate given the very serious nature of the defendant's conduct in this case.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 120 months. A lengthy term of supervised release is critical because it will subject the defendant to ongoing monitoring and sex offender treatment. The conditions of supervised release should include the following conditions, which are conditions imposed in

similar cases, and conditions that are generally recommended by the United States Probation Department:

(1) The defendant must register as a sex offender and submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2) The defendant must undergo and comply with sex offender evaluation and treatment.[8] This may include the use of polygraph testing as part of the therapeutic process.

(3) The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

(4) The defendant will not have direct contact with minors without the written approval of probation. This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office.[9]

---

[8] The government, however, does not specifically request the physiological testing (penile plethysmography testing).

[9] The government understands that the Court has included a provision in its sample supervised release conditions that the defendant should not reside in close proximity to locations frequented by minors, such as schools, public pools, playgrounds, and video galleries. The government is concerned that the list may be both over-inclusive and under-inclusive. For example, the list does not include daycare centers. The list also includes schools without distinguishing an elementary school from a community college school. Because the defendant must get all of his prior residences pre-approved by the United States Probation Office, the

Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

As it relates to the above conditions, first, the defendant will be required by statute to register as a sex offender as a result of his convictions in this case. Second, the defendant's crimes stem from his online communications. Thus, the defendant's use of the Internet to commit his crimes justifies monitoring his future use. Third, the defendant's effort to have sex with a child and his distribution of child pornography justify monitoring his direct contact with any minors and support the imposition of sex offender evaluation and treatment.[10]

**5. Avoiding Unwarranted Sentencing Disparity**

The government believes that a sentence at the low-end of the guidelines is appropriate in this case and would not result in unwarranted sentencing disparity. Below are a few examples of other cases in this jurisdiction which involved conduct comparable to the defendant's. Note, however, that these defendants pled to Possession of Child Pornography instead of Distribution of Child Pornography, even though their conduct is comparable. Thus, there was no mandatory minimum sentence of 60 months that was applicable to the below cases:

In United States v. Christopher Cymerman, Case No. 15-CR-179 (Contreras) Cymerman, who was 20 years old, pled guilty to one count of Travel with Intent to Engage in Illicit Sexual Conduct (Travel) and one count of Possession of Child Pornography, and was sentenced to 30 months of incarceration on each count to run concurrent, including 12 months of home confinement. Cymerman traveled to Washington, D.C. to have sex with a child after a series of

---

government is satisfied that the probation department can make the proper judgment as to whether the area would be suitable for the defendant.

[10] The Court has requested that the parties consider a condition that restricts the defendant's access to adult pornography. The government would defer to the Court and the United States Probation Office as it relates to this condition.

online communications and distributed child pornography to the undercover detective. Upon his arrest, police seized a zip-lock bag containing a single use amount of crystal methamphetamine, consistent with Cymerman's text messages that he might bring the drug for the child.

In United States v. Steven Sollera, Jr., Case No. 14-CR-225 (Chutkan) Sollera pled guilty to one count of Possession of Child Pornography and one count of Travel, and was sentenced to 60 months incarceration. Sollera traveled to Washington, D.C. to have sex with a child (who was purportedly 8 years old) after a series of online communications and distributed child pornography to the undercover detective.

In United States v. Ryan Chord, Case No. 14-CR-195 (Cooper), Chord pled guilty to one count of Possession of Child Pornography and one count of Travel, and was sentenced to 54 months of incarceration. Chord traveled to Washington, D.C. to have sex with a child (who was purportedly 8 years old) after a series of online communications. Chord distributed 17 images of child pornography to the undercover detective.

In United States v. Matthew Scanlon, Case No. 14-CR-7 (Contreras), Scanlon pled guilty to one count of Possession of Child Pornography and one count of Travel, and was sentenced to 51 months incarceration. Scanlon traveled to Washington, D.C. to have sex with a child (who was purportedly 12 years old) after a series of online communications. Scanlon distributed two videos and one still image of child pornography to the undercover detective during their communications.

In United States v. William VanSant, Case No. 13-CR-233 (RLW), VanSant pled guilty to one count of Travel and one count of Possession of Child Pornography and was sentenced to 70 months of incarceration. VanSant traveled to Washington, D.C. to have sex with a child after

a series of online communications. VanSant also distributed child pornography to the undercover officer during their communications.

In United States v. John Cunningham, Case No. 13-CR-288 (BAH), Cunningham pled guilty to one count of Travel and one count of Possession of Child Pornography and was sentenced to 51 months of incarceration. Cunningham traveled to Washington, D.C. to have sex with a child after a series of online communications, during which Cunningham distributed child pornography.

In United States v. Frederick Singletary, Case No. 13-CR-166 (Howell), Singletary pled guilty to one count of Possession of Child Pornography and one count of Travel, and was sentenced to 28 months incarceration. Singletary traveled to Washington, D.C. to have sex with a child (who was purportedly 12 years old) after a series of online communications, and distributed child pornography images to the undercover detective.

In United States v. Kaylan Cureton, Case No. 12-CR-147 (Wilkins), Cureton pled guilty to one count of Possession of Child Pornography and one count of Travel, and was sentenced to 48 months incarceration. Cureton traveled to Washington, D.C. to have sex with a child (who was purportedly 12 years old) after a series of online communications, and distributed child pornography images to the undercover officer.

Notably, while these sentences vary widely, the factors that typically result in courts imposing sentences within or closer to the sentencing guideline range includes cases in which there is indicia of a sexual interest in children or "hands on" abuse of children, cases where the defendant has a criminal history, and cases where there are other indicia that the defendant is not likely to be susceptible to rehabilitative efforts. Cases in which courts vary significantly downward from the guidelines tend to include those where the conduct is isolated and

unaccompanied by other indicia of a likelihood of "hands on" abuse or other criminal activity, the defendant has no criminal history, the defendant provided significant cooperation, or of his own initiative, engaged in significant efforts and/or rehabilitation in advance of any order by the court to do so.

Here, as the pre-sentence report made clear, the defendant has not elected to participate in any treatment or rehabilitative programs. PSR ¶ 104. He distributed "hands on" abuse images depicting fathers who were presently sexually abusing their children, and the defendant did so to two separate undercover agents within a short time-span. The defendant posted his own perverse messages on Craigslist in an effort to attract like-minded individuals, and was engaged in this behavior for at least a year, if not longer. The defendant also stated a sexual interest in his daughter, taking photographs of her and admitting to spying on her in the bathroom through a peep-hole. Accordingly, it is clear that these actions were not isolated in nature, but on-going, repetitive, and dangerously escalating.

## IV. CONCLUSION

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment at the low end of the guideline range, to be followed by 120 months of supervised release, with the recommended conditions of supervision. The defendant is further required by statute to register as a sex offender for a period of 15 years.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

__/s/___________________________________
Lindsay Suttenberg
Assistant United States Attorney